| United States District Court | Southern District of Texas |
|---|---|

| | | |
|---|---|---|
| Pressure Systems International, Inc., | § § § | |
| Plaintiff, | § § | |
| versus | § § | Civil Action H-08-245 |
| Airgo IP, LLC, et al., | § § § | |
| Defendants. | § | |

## Opinion on Summary Judgment

1.  *Introduction.*

   This dispute has devolved from two failed business relationships. A company fired its manager. He convinced one of the company's engineers to help him design a competing product; later he patented it.

   The engineer then stopped working for the company and began to work for the manager's new company. Things soured between these two men, and the ex-manager fired the engineer.

   Long after he left its employ, the engineer then assigned any rights he might have to the patent back to the original company. The original company now wants a declaration that the engineer is a co-inventor and that his assignment to it is valid.

2.  *Background.*

   A.  *Assignment Clause.*

   Pressure Systems International, Inc., builds and sells automatic tire inflators for semi-trailers. Systems, under the direction of Anthony Ingram, hired Southwest Research Institute to supply it with consulting engineers. Southwest agreed that inventions of its engineers would be the property of Systems, and, at the direction of Systems, it would assist Systems with patent applications based on those inventions. The contract read:

6. SwRI represents that each of its employees assigned to work on the Project will have entered into a employment contract with SwRI which provides for the assignment to SwRI of all [of their] inventions . . . within the . . . contract with Client. If . . . an SwRI employee as a result of his work on the Project makes an invention . . . which relates exclusively to the Project, SwRI shall promptly make the fact of such invention or discovery known to Client. At Client's request, SwRI shall use its diligent efforts to cause its employees to execute all papers necessary or incidental to timely and proper applications for Letters Patent of the United States . . . and to convey to Client complete title to all such inventions and discoveries.

7. SwRI shall not undertake simultaneous research and development projects for more than one client when, in the judgment of SwRI, the objectives of the projects or the nature and scope of the work required to be done may result in a conflict of interest.

B.   *Bradley and Ingram Meet.*

John Bradley worked for Southwest on Systems's projects from 1994 until the summer of 2001. During the mid-1990s, Bradley became friends with one of Systems's presidents, Anthony Ingram. Tim Musgrave, the president of Systems, fired Ingram in April of 1997.

About three months later, Ingram met privately with Bradley about a design for a competing inflation system. Ingram secretly recorded this conversation and produced the recording in this litigation.

In this conversation, Bradley reassured Ingram that he would not tell Systems about their meeting, and Bradley reassured Ingram that he was only working on a drive axle for Systems at that time. Ingram then told Bradley that he had been approached by competitors who wanted to buy what he knew about confidential Systems information. Ingram told Bradley that he had declined because he had "fiduciary duties to them." Ingram instead proposed that he wanted to compete with Systems by marketing a better, cheaper product.

Ingram then showed Bradley his preliminary sketches for a competing inflation system. Throughout the conversation, Ingram repeated that he believed that some elements of the device were "patentable." He talked about visiting a patent lawyer, applying for the patent, and

having Bradley test the design for him. At one point he invited Bradley to join him, saying, "I mean, my point is there's opportunities for people that, you know, if you want to be a part of this thing, somehow on the side, if you want to do that or if you just want to charge me hourly and just walk away from it there or if you 'want in' on a patent, you know, it's – I don't know, I'm just throwing these things out. It's up to you because right now, you know, we don't have a system."

According to Ingram, Bradley also signed a consulting agreement with Ingram in August of 1997. The agreement said that Bradley forfeits any ownership in his work to Ingram in exchange for the payment of an undisclosed amount. Bradley denies both that he signed this agreement and that he was paid. He said that he helped Ingram as a friend, making his contribution a gift.

Bradley drew pictures of a rotary union for Ingram during August, September, and October of 1997. Ingram says that he paid Bradley with 18 checks from a company called PS Little Additions. PS Little Additions was a jewelry design company that Ingram set up for his mother and his aunt. He was president of the company and was on its payroll. The PS Little Addition checks were made to cash and range in amounts from $55 to $1,000. Most of them are dated from October of 1997. Susanne Ingram swore that she was with Ingram when he cashed the checks and that she was in the car while Ingram paid Bradley at Southwest. She also said that she saw Ingram hand Bradley an envelope of cash while the three were eating lunch.

C.   *Patents.*

On August 14, 1998, Ingram filed a patent application for a "rotary union assembly . . . for use in automatic tire inflation systems . . . on tractor trailers having pressurized stationary axles." Suspicious of Ingram's activities, Musgrave, who was still at Systems, hired a private investigator to tail Ingram during 2000. Musgrave said he learned from the investigator that Ingram was working on a "similar system tire" and that he planned to compete with Systems.

Ingram's patent was issued as '645 on August 22, 2000. Ingram assigned this patent to Airgo IP, LLC, his holding company. Musgrave reviewed the patent a month or two later and claims that he did not know of Bradley's involvement in its design at the time. Bradley says that he also knew that Ingram had a patent in 2000 but was not sure what it covered.

Ingram formed Airgo Systems, LLC in 2003. Bradley worked for Airgo from April of 2003 to May of 2004. He tested Airgo's trailer system. Ingram said that Bradley signed a consulting agreement on Ingram's request in May of 2003. The agreement fixed Bradley's pay at $55.00 per hour and included the same proprietary clause as the 1997 agreement. Ingram produced this agreement. It is nearly identical to the one that Ingram said Bradley had signed in 1997 – the difference is that the 1997 agreement is between Bradley and Ingram, and the 2003 agreement is between Bradley and Airgo. Bradley said that he did not recall signing this agreement.

In July of 2003, a second patent was issued to Ingram, numbered '019. This patent was an improvement to the '645.

In April of 2004, Airgo fired Bradley. In response to his termination, Bradley e-mailed Ingram to remind him that the rotary union was his design and that he did the drawings. Ingram responded that Bradley was paid for his work on the drawings.

Ingram's third patent on the rotary union issued in November of 2005.

D.   *Suits.*

Airgo began to lose its market share, and it sued Systems for patent infringement on the tire inflation system in Oklahoma in December of 2005. Systems answered the suit in August of 2006. Systems defended by saying that its in-house engineer, Mark Naedler, or other employees were the true inventors of the Airgo patents – not Bradley. Then, on December 20, 2006, Airgo revealed the secret recording of Bradley and Ingram's meeting. Airgo also produced the consulting agreements from 1997 and 2003 between Bradley and Ingram in the spring of 2007. While the 2003 agreement had both Bradley's and Ingram's signatures, the agreement from 1997 was not signed.

Systems says that it did not learn about Bradley's contributions to Airgo's patents until this time. After learning about Bradley's meeting with Ingram, Systems paid Bradley $2,500 for a quitclaim to the three Airgo patents on March 15, 2007. Bradley also swore that this meeting was the first time he told Systems about his involvement with Ingram. On April 26, 2007, Airgo produced a signed version of the agreement from 1997, explaining that it had accidentally produced the unsigned version earlier.

On May 15, 2007, Systems filed this suit in Harris County for a declaration that Ingram's consulting agreements are void. Airgo removed that suit to federal court on June 14, 2007.

In July of 2007, the Oklahoma federal district court in Airgo's suit ruled that Systems's and Airgo's products did not infringe each other.

In August, the Texas federal suit was remanded. In January of 2008, Systems amended its petition in Harris County to seek an additional declaration that its quit claim from Bradley qualifies it as a bona fide purchaser. The next day, Airgo removed the suit a second time to this court.

Systems now seeks a declaration that Bradley is a co-inventor of the Airgo patents, that Bradley's assignment to Systems of his inventorship interest in the Airgo patents is valid, and that the existence of a consulting agreement between Bradley and Ingram does not vitiate System's assignment.

3. *Wrong Statute for Inventions.*

Systems has sued under the Texas and federal declaratory judgment acts. It should have sued under the Patent Act, which authorizes the correction of named inventors. 35 U.S.C. § 256 (2006). *See also MCV, Inc. v. King-Seeley Thermos Co.*, 870 F.2d 1568, 1571 (Fed. Cir. 1989).

4. *The 2007 Assignment.*

Systems acquired whatever rights Bradley had through his quitclaim on March 15, 2007. The first question is whether Bradley had already forgone his claim of inventorship through his own inaction, leaving him with nothing to transfer to Systems. Airgo has to show that Bradley's delay was unreasonable and that his delay injured it. The delay is measured from when Bradley knew or should have known that the patent issued. *Advanced Cardiovascular Sys., Inc.*, 988 F.2d 1157, 1161 (Fed. Cir. 1993). Laches is presumed when the delay is longer than six years. *Id.* at 1163.

A. *Bradley's Contribution in 1997.*
(1) *Delay and Prejudice.*

Laches voids Bradley's interest in the work he did for Ingram in 1997. Bradley knew in the summer of 1997 that Ingram intended to patent the inflation system. During the recorded conversation, Ingram mentioned preparing his idea for patent several times. He talked about the design's patentable parts and about getting assistance from his patent lawyer.

Bradley has also sworn that he knew about a patent that issued to Ingram sometime in 2000. A patent is a public record that notifies the world of its contents. *Wine Ry. Appliance Co. v. Enter Ry. Equip. Co.*, 297 U.S. 387, 393 (1936). Considering that he helped Ingram with a design a few years earlier, he had the responsibility to find out more about the patent's subject. That he did not know the details of the patent does not excuse his lack of inquiry.

Finally – and worst – Bradley worked for Airgo and Ingram for over a year in 2003-2004. Although he says that he worked on other components than the rotary union that he claims as his own, he used and tested the inflation system regularly. After Ingram fired him, Bradley reminded Ingram in e-mail that the rotary union was his design – verifying that Bradley had not forgotten about their meeting in 1997 or its relevance to Airgo's business. That Bradley may have hoped his business relationship with Ingram would work out does not excuse his delayed assertion of inventorship.

Airgo has been prejudiced by this delay. Ingram founded the company to compete with Systems by marketing a better automatic tire-inflation system – whether he has succeeded is another story. He expended time and money in applying for the '645 patent and its successors. He obtained financing. Because Bradley has no excuse for his delay and it would injure Airgo, Bradley's claim to inventorship is barred by laches.

This case is similar to one where a co-inventor was "discovered" during the other inventor's infringement action against Verizon over a wireless system. While that suit was pending, Verizon paid Frugoli, a purported co-inventor, $200,000 to sue the named inventor for a correction of inventorship. There, the court was convinced that "but for the discussions with Verizon's counsel and the substantial payment he received, Frugoli would continue to sleep on his purported rights today." *Frugoli v. Fougnies*, 2004 U.S. Dist. Lexis 28141, * 18 (D. Ariz. 2004).

Systems bought Bradley's interest with full knowledge that Bradley had sat on it for years. It assumed the risk that he had waited too long to bring his claim. It is not necessary to

reach the validity of the disputed consulting agreements from 1997 and 2003, because Bradley has no interest to transfer to Systems. The price for Bradley's interest as co-inventor was $2,500, a fair indication of its expected value.

(2) *Unclean Hands.*

Systems's assertion that Ingram misbehaved does not excuse Bradley's delay. Ingram specifically included Bradley in what he was doing. He later hired him. He may not have been honest with Systems, but Bradley knew everything. What Systems did not know about Bradley and Ingram cannot absolve Bradley of his neglect. Systems inherited Bradley's rights. Bradley has no unclean-hands defense. If Ingram misbehaved, Bradley misbehaved more because he was still working for Systems when he met with Ingram.

Systems has also already tried to show that Ingram breached his fiduciary duty to it – and failed. The Oklahoma court, ruling on System's counterclaims, held that Systems failed to produce evidence of damage resulting from Ingram's conduct and granted summary judgment for Airgo on Systems' claims of misappropriation of trade secrets, breach of fiduciary duty, and breach of contract.

B. *Bradley's Work for Airgo from 2003-2004.*

Bradley's work for Airgo did not create an interest in the later patents. His work product belonged to Airgo by virtue of his employment, whether or not he signed a consulting agreement. He was compensated for his work and both sides behaved as if Bradley's interest, if any, was assigned.

Additionally, Bradley has not produced drawings, memoranda, or other records from this period to suggest that he conceived of or contributed to the later patents. He worked mainly to test the product. By his admission in his e-mail to Ingram, his claim for inventorship of the later patents is derivative of the designs he said that he drew for the '645 patent in 1997.

5. *Assignment Under the Southwest Contract.*

The question remains whether Southwest's consulting contract with Systems automatically assigned Bradley's inventorship interest to Systems. Here, laches would not apply because Systems did not know that Bradley double-crossed it until the secret recording was revealed in the Oklahoma litigation.

A.  *Language of Present Assignment.*

The contract between Southwest and Systems was signed on May 7, 1993, by Southwest's director for contracts and Ingram on behalf of Systems. This contract says that Southwest promises that its employees will sign an agreement that "provides for the assignment" of the invention to Systems, and "will use its diligent efforts . . . to convey to Client complete title. . . ."

In February of 1995, Bradley signed a non-disclosure agreement with Systems. In it, he broadly promised not to divulge evaluations of Systems's products, trade secrets, business methods, business contacts, marketing, or patent applications.

Although contract construction is a matter of state law, a court of appeals for the Federal Circuit has said that whether an assignment clause passes title automatically is "intimately bound" with standing in patent cases and is a matter of federal law. *DDB Tech., LLC, v. MLB Advanced Media, LP*, 517 F.3d 1284, 1290 (Fed. Cir. 2008). If the contract expressly grants rights in the inventions, no future transfer of legal title is needed. But if the contract is merely a promise to assign in the future, it only vests the assignee with equitable title until the legal assignment is executed.

A federal standard in this area is unnecessary and unwarranted. Many states, including Texas, have already said the same thing. *See United States v. Cent. Gulf Lines, Inc.*, 974 F.2d 621, 630 (5th Cir. 1992) (assignment of claims); *Kinetic Concepts, Inc. v. KCI Licensing, Inc.*, 2005 U.S. Dist. Lexis 32196, *8-9 (W.D. Tex. 2005) (assignment of contract rights), *Camco Int'l, Inc. v. Perry R. Bass, Inc.*, 926 S.W.2d 632, 636 (Tex. Civ. App.–Fort Worth 1996, writ denied) (assignment or license).

This contract does not contain present language of assignment. Instead, it says that the Southwest consultants will sign agreements that assign their rights to Systems, and that Southwest will work "to convey" title. This is an agreement to assign; it conveyed only equitable title to Systems.

B.  *Personal Property.*

Systems wants the court to find that Airgo's patents are governed by the agreement between Bradley and it. While a patent is the right to exclude, by statute it has the characteristics of personal property. 35 U.S.C. § 261 (2006). Agreements about patent rights do not run with the patents; they are also personal. *See Jones v. Cooper Indus., Inc.*, 938 S.W.2d

118, 124 (Tex. App.–Houston [14th Dist.] 1996) (obligation to pay royalties under a patent-rights agreement did not extend to third-party purchaser with knowledge of the agreement).

Assuming Bradley is a co-inventor, he breached his agreement with Systems. Systems's recourse is against him or Southwest rather than having the court declare him co-inventor on Airgo's patents.

### C. Not Covered.

Further, it is far from clear that Bradley's ideas are even covered by the agreement. The agreement covered only inventions relating to a specific project. The Oklahoma court held that Airgo's and Systems's products do not infringe each other. Assuming that Bradley contributed to Airgo's patents, whatever Bradley and Ingram did was sufficiently different from Systems's product that it neither infringed nor constituted a breach of fiduciary duty by Ingram. Bradley's conception, then, was not a subject within the assignment provision at all.

## 6. Already Decided.
### A. Preclusion.

Systems may not re-litigate inventorship. A final judgment on the merits precludes a party from suing on issues that were or could have been raised in an earlier action. *Federated Dep't Stores v. Moitie*, 452 U.S. 394, (1981).

Systems raised inventorship as a counterclaim in Airgo's infringement suit. The court held that Airgo's and Systems's products did not infringe each other. Systems's counterclaim about inventorship was denied. Airgo appealed the decision, and the court of appeals affirmed it without an opinion.

Systems had the opportunity to question the denial of its inventorship claim on appeal. It did not. The court of appeal's affirmation makes the district court's opinion binding in this case. *But see McSherry v. Giannuzzi*, 717 F. Supp. 238, 241 (S.D.N.Y. 1989) (inventorship not barred by the proceeding before the Board of Patent Appeals and Interference because the petitioner could not have pleaded alternate theories).

### B. No Injury.

To have standing to seek general declaratory relief, Systems must identify a recurring or impending injury. It has not – and cannot. The Oklahoma court held that Systems's products

did not infringe Airgo's and that Ingram did not breach his fiduciary duty to Systems. No current or impending injury needs redressing.

Even if Systems were declared joint inventor, it also could not sue on Airgo's past, present, or future use of the patent. As a co-inventor, Ingram and Airgo have the right to use the patent without permission from other co-inventors. 35 U.S.C. § 262 (2006) *see also Crown Die & Tool Co. v. Nye Tool & Mach. Works*, 261 U.S. 24, 40 (1923) (suit at law must be brought by the holder of the legal title at the time of infringement); *Papazian v. Am. Steel & Wire Co. of New Jersey*, 115 F. Supp. 111, 116-17 (E.D. Ohio 1957).

7. *Conclusion.*

While working at Southwest Research Institute, John Bradley promised to assign his inventions to Pressure Systems International. His agreement was not a present assignment; it was agreement to assign in the future. Bradley also waited too long to assert an interest in the invention, leaving him with nothing to assign to Systems in 2007. Further, the issue of inventorship had already been decided on the merits in Oklahoma. System's claim is precluded, moot, and meritless. Systems will take nothing from Airgo IP, LLC, Airgo Systems, LLC, and Anthony Ingram.

Signed on August 31, 2010, at Houston, Texas.

_____
Lynn N. Hughes
United States District Judge